Case No. 13-5293NL Humane Society of the United States Appellants Harvey Dillenberg and Iowa Citizens for Community Improvement v. Thomas J. Vilsack Secretary of the U.S. Department of Agriculture Mr. Penzer for the appellants, Ms. Wright for the appellee Good morning. Good morning. May it please the court. Thirty years ago, the government offered pig farmers an opportunity to create and operate a promotion program for their benefit according to certain rules that the government would follow if producers agreed to fund it. The rules were published as part of the pork order and a referendum was held. Producers approved it. They agreed to accept the burden of funding it, and the rules became what comprised the pork order. Let me illustrate. We've had several discussions of the injury in this case and what's actually being complained of. So to illustrate the injury in its simplest form, I think it's seen in the example of if a farmer goes to a local radio station and buys $1,000 of promotional ads, the radio station runs $700 worth of ads and gives $300 to a political organization. The farmer has two injuries. Injury one, he didn't get what he paid for. He didn't get his $1,000 worth of promotional ads. He got $700. Regardless of what the other $300 worth of ads would have returned to him, he still is injured because he didn't get what he paid for. Is it your theory that every time a producer who's paid the fee disagrees with the way the board spends the money, that that creates an action of the APA? No. What's the limit on the principal debt? Why is your case different from that? We acknowledge, and I think we put in our briefs, the issue of at some point the agency has broad discretion under the APA. Congress has set out the three categories of activity, promotion, research, consumer information, and set standards of basically discretionary spending. It has to be effective. It has to be reasonable. I'm just curious. How many producers are we talking about here who make contributions who are assessed fees? What's the total number? 69,000 approximately. I'm sorry? Approximately 69,000. Certainly there can't be unanimity amongst the 69,000 about the way the board spends the money for those activities, right? There's no doubt. There's no doubt that there can't be. And so what we've argued to the court, and it's in our briefing, is we're not contesting unwise decisions. What we're saying is if the court spends $1,000 on a car that appears to have a market value of $5,000, I mean $100,000, that's something that's reviewable. If it's among $5,000 cars. I don't understand why, in response to Judge Griffith's question, on your theory of standing, why doesn't everyone have standing to say that the way you're spending my money is ineffective? The statute uses the term effective. Somebody says ineffective. Now, that might be a dead loser on the merits. But in terms of standing, wouldn't all 69,000 producers have standing? All 69,000 producers represent a discrete class, yes. I'm sorry I misunderstood the question. I thought it said any decision they don't like as opposed to any decision that they actually believe violates the discretionary limit. So is the clearest basis for standing the payments for a slogan that is no longer being used? And if, I mean, I know this is at the pleading stage, but if you were to, can you sketch for us briefly, even generally, what you would use to prove that this is, as I gather it, you're alleging this was already purchased by the producers with producers' money. That's right. And then sort of double paid for by licensing it back with producers' money. And then just to add the icing on the cake, continue to be paid for after it's no longer being used. How would you prove those allegations? Well, we have in the complaint, and I believe it's in around paragraphs 83 and 84, and 73 to 76, the fact that there were no other buyers, the corporate knew there were no other buyers, and there never would be any other buyers. This was a market of one, and they agreed to quadruple the annual price that they were paying for this mark. It's akin to sitting alone in an auction house and outbidding yourself until the price goes up. The issue is whether or not the circumstances surrounding this deal are the type that would be seen in an arm's-length transaction. And you don't have that. And you don't have this licensing price that goes from $1 to $800,000. That's more than twice as much that the board's economist said they should be paying for the mark without any explanation of why they're doing it. And the only evidence is an email that says that should get MPPC the money they need for the next few years. And these are all alleged in our complaint between paragraphs 55 and 65, the efforts that the two organizations were engaging jointly to find a revenue stream for MPPC. So wholly apart from the character of MPPC as a lobbying organization, if they were just a mark holder, you would still say you've been concretely harmed, your client has been concretely harmed, and has stamped it. Well, I think that our most basic argument on behalf of the producers is, yeah, this is essentially a worthless mark at this point. And you've thrown away our money. Yeah, you're taking their money and you're not giving them anything. And even after it's been replaced, you're paying the exact same as when you claimed it was for a feature role. And you don't pay the extras in a movie the same as you pay the leading actors. So the question is, what's going on here? They haven't even addressed the fact that this mark went from their featured mark to a replacement backup, but they're still paying full price every year, even though they can get out. For something that was paid for initially by the producers, am I right about that? That's correct. Or is the allegation that this is like a mortgage we're continuing to pay? Yeah, we live in the house, but we're continuing to pay the initial price. We've alleged that paragraph 33 and 80 to 82, the history of this, that from day one, every promotional dollar that was used to build value into Pork the Other White Meat was taken from producer checkoff funds. They took $500 million of producers' money to build value into the funds and then tried to sell that back to them based on the new value. Okay. And without giving any accounting for that credit, which they should do under 123088. So this is a little bit of a non sequitur, but can you talk about the exhaustion arguments? Yeah. Why are your clients not subject to exhaustion, including separately for the organizations and the individual? Well, the exhaustion language is set up for a very specific type of challenge to the lawfulness of the order or to the lawfulness of someone's inclusion in the order. It has two basic forms of relief, which is a modification of the order or an exemption. So the first two, if someone believes that the actual order itself or provision of the order is unlawful, they can seek a modification. And that would be, I would call it a facial challenge to the order. But if somebody feels that they are unfairly or wrongly being included on the order, they can challenge and seek an exemption. Those are the only two options available for Pork Act review. For whether or not an established rule has been violated, that's not the type of relief. Why? Because the government's argument is that modification of the order allows that type of relief. One modification of the order would be that there will no longer be expenditures in the way that you're challenging them. Well, the order is codified already by regulation. It's subpart A. Actually, it's 7 CFR 1230. So the terms are set, and I believe 7 U.S.C. 4805 says these are what shall be included in an order and nothing else. The government is saying that, well, we can alter obligations, but I'm not sure what obligations need to be altered. We don't need a word of the pork order to be changed or modified at all. We're not complying with the order. We're saying these are the rules. We need somebody to stop breaking them. So it would be a little odd. I mean, basically what they're saying is you could add in there some – it's sort of like you've got your regime of rules, and you could add in there, and by the way, as these rules are being applied, these bad things have happened. Don't do them anymore. So it feels a little like the wrong – And by the way, please stop breaking the – we're okay with the current order. We think the current order prohibits this. If we thought that we needed to be out of the current order, we could seek an exemption. But the producer's position is as long as we're paying in and you've promised us this promotional program and you promised it would be effective and that it wouldn't be diverted to political uses, we expect that at least we're going to get that. Whatever the return, we expect that at least we're entitled to the promotional – to the effective promotion that we've put in. We don't need the order changed, and we don't need to be excluded. I'm not sure what – other than for exempt producers, I'm aware of no other basis for exemption. That language – the language in the Pork Act Review, I believe, was borrowed from the Agricultural Marketing Agreement Act, which contains a lot more basis for exemptions. There aren't any here. Do you allege that the board diverted money to MPPC for the purpose of lobbying? For the purpose? Is that something you have to prove? Does the purpose matter to your allegations, or is it simply that it's being done in a way that sort of violates, in effect, the fiduciary duty that the board has to its – For the purpose is written into the statute, and we track the language, and I believe that the interpretation of the way the statute is written is assessments may not be used in any manner for the purpose of influencing legislation. So to me, that means that the prohibition attaches to the funds. So if this was – and basically it means that if this is not a real deal, you can't get around that prohibition by giving – I can't spend it this way, but I'm going to get somebody else to do it and basically avoid that prohibition. But you also have – I guess you have an argument that requires less of a steep showing on your part, which is, well, if it's not being used for promotion, research, and consumer information, then regardless of whether the purpose is a prohibited purpose, the fact that it's being given to NCCP for whatever is also forbidden. That's right. So you have sort of nested different arguments. So injury one is they're just not getting what they pay for. This is not effective promotion. You're giving it to a lobbying organization. So you don't have to prove both injuries, at least in order to – And any one of those injuries would be sufficient to find standing for the entire case because any one of them would address all of the issues and all the relief. So even just at the point where producers aren't getting – the allegation that producers aren't getting what they paid for would be enough to – And what are the strongest allegations that you have for the purpose of lobbying? Just factually, what are the facts that show that? I think they're largely contained in the efforts between the two that we alleged between 55 and 65 paragraphs in our complaint. This began in 1999 with the Office of Inspector General report saying these two entities are too close. These two entities are too close, and producers are having trouble even telling them apart. And they ended up having to do an operational separation in 2001. And after – so that day, approximately 90 MPPC employees suddenly became court employees with change in loyalty from their investors to the government and all producers equally. And MPPC's operating revenues plummeted from $40 million a year to $2.6 million a year. And we have it at paragraph 60 that they needed more to be effective. And the two entities together formed a one-organization task force. I think that was the name of it. The one-organization task force to find ways to secure a long-term revenue stream. Now, what's important about that is that the Chekhov revenue stream was never in jeopardy. The only organization that still needed a revenue stream was MPPC. So the Chekhov – the Port Board had no reason to participate in this one-organization task force to help find a revenue stream for MPPC. Then when they did the licensing negotiation where they agreed to pay double what the Port Board's economists said it was worth, the president of the Port Board said that that should get MPPC – that should allow MPPC to get the money they need for the next few years. And that's at paragraph 63 in our complaint. Now, again, we're talking at the pleading stage. The question is whether or not these circumstances can be plausibly interpreted as an effort to really find a way to get Chekhov revenues over to support MPPC's operations. We certainly think – allege that. And at this point, we're entitled to – at the pleading stage, we're entitled to have those general allegations and embrace the specific facts that would be necessary to prove them. I think the only – the other – there are more – the aspects of the deal itself that are really troubling, about trying – the allegation that they were trying to evade FOIA requirements, about trying to not keep – You're willing to – your rebuttal time is over. We have your argument. We'll give you a couple minutes back. Thank you. Okay. Thank you very much. Good morning. Abby Wright, on behalf of the Secretary. I'd like to begin – I think the – my opposing house will make clear they have sort of two sets of arguments here, kind of the lobbying arguments and then the we didn't get what we paid for arguments. And with respect to the Humane Society's associational standing, I just wanted to make the initial point that it is not germane – pork promotion is not germane to their purpose. So regardless of whether you think the pork producer has that injury, the Humane Society should not be bringing that – this suit on behalf of their member. The Humane Society is not in the business of promoting pork consumption in the United States. I also wanted to just – it goes to the merits, but just to say we haven't had briefing on the merits in this case. We are at the pleading stage. We haven't had development of these issues. But the agency does not agree with the facts as contained in the complaint. I think – I don't want to go into it, but I just wanted to make that statement. Just on your one point, it seems like part of the purpose of this lawsuit and the reason the Humane Society is involved is, you know, really to prevent cruelty to the animals that are subject to this. And that's something their members care about. I think that's true, that that is their purpose. And so with respect to their claims of injury arising out of the actions of the National Pork Producers Council lobbying and the state legislatures who have not passed the bans they seek, I think we didn't dispute the germaneness on that. But I think those injuries have a lot of other problems, especially traceability and redressability, because what they're complaining about are the actions of the third party, the Pork Council. And to get what they want, they need state legislatures to ban these practices that are, in fact, legal. Well, I think they'd be happy with just saying, don't lobby against animal safety and animal humaneness. I think that would be it. Well, the harms as alleged in the complaint are harms to their pork farming. And I think what the nature of their claims here is that there's sort of a race to the bottom. So big pork farmers do these things because they're cheaper. Our pork is more expensive because we don't do them. We make everybody do it. We're at a less of a competitive disadvantage. And so I think that's really the nature of that injury. But that injury, explained in our brief, really stems from the third party choices of the Pork Council and of the states who have not banned these practices. They've made some progress in other ways. I do have a question about lobbying. MPPC is a, I thought you said in your brief, a 501c3. Aren't they supposed to not? They have very strict restrictions against lobbying. I was just a little bit confused about the underlying facts. I have not looked into that issue. I'm not sure, Your Honor. The National Pork Board is the quasi-governmental entity here. I'm not sure. The board is quasi-governmental, but the National Pork Producers Council is a 501c3, at least as you said in your brief. And my understanding is they can't spend more than a million dollars or something on lobbying. It's quite strict. You know, we haven't had a factual development here. So all we have is plaintiff's statements that they have spent this money on lobbying. I don't know if that's true. I don't know if they've not followed the rules as they're supposed to. I just don't have any information. So can you talk about the pork producer theory and the particular theory that not getting what I paid for? And let's just assume that, as the individual, let's just assume that the allegation is that this is just a giveaway. So I think we would have a very different case, Your Honor, if the allegation really were they took $3 million and they set it on fire for fun. What we have here instead, if you read the complaint and really look at what they allege in the complaint, they're saying that the pork board paid too much money, that they think the pork board should have put that money towards something else. And so the closing counsel said that he doesn't think pork producers have standing to come in and say, I disagree with that, I don't like that. If you read their complaint, that's really what they're talking about here. And our position is not that a pork producer would never have standing to bring a suit. It's just that they haven't spelled out in their complaint how they're harmed in light of the fact that the National Pork Board got something of value when it bought the trademark. Well, what if their argument is that you paid X amount for this trademark. You shouldn't have paid anything because at some point you switched. And I'm not talking about the merits. There may be all kinds of problems with the merits, but this is just the allegations. At some point, switched. It was worth nothing. You shouldn't have paid anything. That's my objection. Well, I think that might be a harder case for us. I don't think that's what their complaint really is. In that case, would there be any argument that there's not standing? If it really was, you gave $3 million away for nothing. Yeah. I think they may very well have standing in that case. Okay. So then they say, well, you gave away $3 million for something that's not worth anything close to $3 million. But they haven't. What they haven't done in their complaint, Your Honor, is flesh out how they were injured. So, for example, they don't tell us. So they don't say anything. All they say is. All they say is misuse has diminished. Yeah. They say you gave $3 million for something that's not worth remotely close to $3 million. So, therefore, you definitely overpaid. But they need to show what that money was likely to be spent on otherwise. I'm not understanding that. Because if the $3 million to $0, if they have standing for $3 million to $0, the argument would be, well, you gave away $3 million for something that was worth $0. Of course we assume that money would have gone to some productive purpose for us. Now my allegation is you gave away $3 million for something that's worth a lot less than $3 million. Of course you would have used the excess in some way. Well, I think they're faced with a couple of problems here, which the district court recognized too. Which is, one, if you look at what happened after they purchased the trademark, things actually got better in the program. So the idea that they need to, I think, show that this was actually not a good business decision. Why? Their argument is, sure, things can get better for all kinds of reasons. They didn't get better enough. They would have gotten even more better had you used the money the right way. Spell that out. Tell me. I think you need to tell this court in the complaint, here's how I think the money would have been spent. Here's how I think the return would have been better. No, more money for the things that the statute calls for. Maybe you're making factual assumptions in your answer that we missed. But things got better back when they first developed the slogan and started using it. But after they stopped using it and continued to pay for it, you can't say there's any causal benefit from the no longer being used. So I want to be clear about a couple things. One, they haven't stopped using it. That's factual, but they have not stopped using it. Number two is they have sort of little heritage. Sometimes it shows up. They use it in their nutritional campaigns. Apparently they coordinate with nutritional magazines, organizations, et cetera, and they want to push the health aspects of pork. They use the other white meat. But in the situation in which it's $3 million for zero, it was a dead giveaway of $3 million, you could have still had positive returns. Nobody would say that in that situation, oh, well, you got a positive return, so it doesn't matter that we blew away $3 million because you still made a benefit. I think that's not our argument, and that's not what the district court's reasoning was. It was not that, like, well, you got enough, what are you complaining about? That's not what I'm saying. What I'm saying is you got a lot after we did this business decision that you say was valueless. That doesn't make any sense, so you've got to tell me in a complaint how you get there. And they just haven't done that. They have one conclusory statement that there was, in their view, misuse, and that diminished, and that's it. So I think we're not taking an extreme position here. We're saying this complaint was not sufficient here to show that kind of standing for that individual producer. So just on the hypo, just bear with me for a second, on the hypo of the $3 million for zero, if all they say is you gave away $3 million, we got nothing in return, and then it's factually incontrovertibly true that, in fact, the program writ large in order to the benefit of the people who are funding it. So you say, well, look, 17% every year. Yeah. Would you say that, well, you need to say more than to explain why the $3 million, what purpose that $3 million would have gone to and how that would have gone to something more than 17%? I mean, it would certainly be a better complaint if they said more. I think our point here is that that's not the situation we have, and so we need to look at the complaint we have and the situation we have and determine whether they've really alleged sufficiently in Article III injury in fact to that producer, and we don't think they have, and the district court doesn't think they have either. Can you explain a little your position on exhaustion? I thought you took the opposite position in the district court from the position you're taking now, and I'm just not sure how the organizations would, in any event, be able to use the exhaustion that you say would be adequate. So we didn't take the opposite position in our briefing. The case developed in the district court in kind of an – I mean, cases do this, but I think it wasn't clear to the government that they were making – that they didn't just want an exemption of what they had paid in. So that was kind of the assumption in the briefing was that they wanted, and that we made the argument that they needed to go under the 4814. And then at the transcript of the hearing, the district court said, could they – sort of just could they straight out get the money back through that, and our attorney said no. And so I think the point we were making was, I guess, a little bit more nuanced here, which is that you could get a modification of the court order. Not that he wanted the money back, but that he wanted the – I'm sorry, yeah, the court order to get the money back from the court counsel. He's saying you're spending this – you're squandering funds. You should get those back. And you said to the district court, that's right, that could not be ordered under – Yeah, so the district court didn't frame it as, could we get a modification of the court order that would address their injuries here, their claimed injuries in the colloquy. And so I think that's where the response came from. But the agency's position in the district court and here is that they could file such a petition that the agency would consider it on the merits. So the one agency determination that we know about reached the opposite conclusion, right, in the McDowell matter? So the McDowell matter, this court only reaches the exhaustion issue if you disagree with us on standing. McDowell, actually the agency – First of all, is that true? Are they – do you take the position that exhaustion is not another threshold determination or do you think that we have to do it sequentially and that standing is something that's set apart under steel company? I don't think this court needs to break new ground by deciding that exhaustion is a non-merit threshold ground that you can reach before standing. I mean, I think we haven't urged the court to do that. The most natural course would be to decide the jurisdictional question of standing before you got to the – I mean, I think we've opened the door that that's a possibility because it's not clear from the Supreme Court cases exactly what falls in that category of things. But the reason I brought up with McDowell was that – so neither the agency nor the petitioners there raised these issues in the briefing at the initial stages. And then when the Secretary issued his decision, he said there was no standing because the injuries were very diffuse and the injuries were just about kind of is the law being followed. There was really not the concreteness that you would want there. And so I think in that way it would be distinguishable from the case here where this court would have said – Well, how does the agency process work? So if this – if you had the effort that you think that they should pursue alternatively, then would McDowell come up in that proceeding and would it pose an obstacle to – Well, I'm assuming this court would have held that they need to do that. So I think they would be bound by what this court had said. So you think we need to definitively resolve that they could get that relief in order – or could we just – Well, I think that that's a sort of procedural mechanism they could use, I guess, is what this court would have resolved. And that's what the McDowell decision sort of after saying – standing and getting to the merits as well also says this is not the right way to do this. And so I think this court would have said it's an adequate – you know, it's an alternative adequate remedy. So that agency would obviously be bound by that. And is what you're telling us binding on the agency? In other words, is the position that you're taking that – I mean, we've cleared it through the highest levels of the agency, and I said specifically to them, I'll be going to court, like, clear it all the way. And what's your position on how exhaustion would apply to humane society and Iowa citizens? I think our position that we took in the brief was that they could not – I mean, they could not avail themselves of that. The statute is very clear that they have to be a pork producer. Right. They're not subject to the pork order, so they don't have a requirement that they exhaust. I think that's right, but then you run into the question of whether they're really supposed to be bringing a suit if Congress has delimited who gets relief under the Pork Act in that way. You might have sort of the milk marketing cases where this Court has discussed sort of who can bring suits. We haven't – we didn't brief that particular issue. Thank you very much. Thank you. We ask that this report be affirmed. Mr. Pender, we'll give you back one minute. Thank you. Regarding the nature of the injury, we do plead in the complaint that the deprivation of the funds causes an injury. It's at paragraph 15, paragraph 121, 128. We specifically say that the – as to the replacement that – to the point that Judge Srinivasan was making, the replacement leading to the injury, we specifically note in paragraphs 105 and 118 that the only reason that the agency has ever actually given for purchasing this or the valuation was based on its value as a way to avoid having to buy a new one. It said, well, if we don't use this, we're going to have to go and buy a new one. Well, then they bought a new one, and so now our allegation is the only basis that we have in the record is that the agency is saying we're buying a new one and we're paying this $3 million to avoid having to buy a new one. If they're going to continue this, at the very least, they need to have a reasoned basis for it, and there's nothing in the record. I mean, there's injury. Okay. Thank you very much. The case is submitted. Thank you.
judges: Griffith, Srinivasan, Pillard